UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
JESSICA SANCLEMENTE-GOMEZ,

                        Plaintiff,

          -against-

THE CITY OF NEW YORK, SIMON
KAWITZKY, JENNY WEYEL and JOHN and
JANE DOE (said names being fictitious, the
persons intended being those who aided and
abetted the unlawful conduct of the named
Defendants),

                     Defendants.
-----------------------------------------------------X

**Docket No.:**

**COMPLAINT**

**JURY TRIAL REQUESTED**

Plaintiff, **JESSICA SANCLEMENTE-GOMEZ**, by her attorneys, **MADUEGBUNA COOPER, LLP**, for her complaint alleges:

## I.    THE NATURE OF THIS ACTION

1.    This is an action to remedy discrimination and retaliation on the basis of sex, pregnancy, familial status and caregiver status in violation of: (1) the Family Medical Leave Act ("FMLA"), 29 U.S.C.A. § 2601 *et seq*.; (2) New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq*. ("NYSHRL"); and (3) New York City Human Rights Law, N.Y. City Admin. Code §§ 8-101 to 131 ("NYCHRL").

2.    Plaintiff seeks declaratory reliefs, compensatory, and punitive damages. Plaintiff also seeks attorney's fees and costs pursuant to 42 U.S.C. § 1988, the NYSHRL and NYCHRL.

3.    Plaintiff contends that the terms, conditions and privileges of her employment relationship with Defendant CITY OF NEW YORK (the "CITY") were adversely affected because of her sex, pregnancy, familial status and caregiver status.

4.    Specifically, Plaintiff, a highly credentialled Hispanic female and young mother

of two children, contends that due to her sex, pregnancy, familial status and caregiver status, and after returning from maternity leave in March 2018, she was not reinstated to her former position or an equivalent position.

5.      Plaintiff was forced to assume a reduced role with little work to do even after several requests.

6.      Plaintiff's career was derailed and mommy-tracked, and she was denied promotion for which she was well-qualified in favor of a less-qualified employee who had not taken FMLA leave, was not a parent and therefore did not need any accommodations, and retaliated against for taking leave by not reinstating her, which eventually resulted in her constructive discharge.

7.      Accordingly, this action is being brought to vindicate Plaintiff's human and civil rights under the law.

## II.      JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

9.      This Court has supplemental jurisdiction over the state and city causes of action pleaded.

10.     Venue is proper in this district under 28 U.S.C. § 1391(b) because the underlying events took place in this district.

## III.     PROCEDURAL REQUIREMENTS

11.     Immediately after commencing this action, Plaintiff will serve a copy of the complaint upon the New York City Commission of Human Rights and the Corporation Counsel of the City of New York, in accordance with New York City Administrative Code Section 8-

502(c).

IV.     **PARTIES**

12.     Plaintiff is a 39 year-old Hispanic female.

13.     Plaintiff was employed by the CITY from August 2008 until her constructive discharge in October 2018.

14.     At all relevant times, Plaintiff was a resident of the City and State of New York.

15.     Defendant CITY is a municipal corporation existing under and by virtue of the laws of the State of New York.

16.     At all relevant times, Defendant SIMON KAWITZKY ("KAWITZKY") was the Assistant Commissioner for the Division of Neighborhood Development and Stabilization ("NDS") in the New York City Department of Housing Preservation and Development ("HPD"), an agency of the CITY.

17.     KAWITZKY is a white male.

18.     KAWITZKY is sued in his personal capacity for monetary damages.

19.     At all relevant times, KAWITZKY was responsible for ensuring that employees are not subjected to discriminatory or retaliatory practices.

20.     At all relevant times, Defendant JENNY WEYEL ("WEYEL") was, from approximately June 8, 2018 to present, the Director of Neighborhood Stabilization in NDS.

21.     WEYEL is a white female.

22.     WEYEL is sued in her personal capacity for monetary damages.

23.     At all relevant times, WEYEL was responsible for ensuring that employees are not subjected to discriminatory or retaliatory practices.

- 3 -

24.     At all relevant times, Defendants were acting under color of the statutes, ordinances, regulations, customs and usages of the United States and the State of New York, and under the authority of their respective positions or offices.

## FACTS COMMON TO ALL CAUSES OF ACTION

*Plaintiff's Skill, Qualifications and Background:*

25.     Plaintiff achieved a distinguished career at HPD, earning satisfactory performance reviews and two promotions over the course of ten years, as well as serving in various positions of increasing responsibility.

26.     At the time of her constructive discharge on October 9, 2018, Plaintiff was Program Director of Preservation Initiatives in HPD's Unit of Neighborhood Stabilization ("NS"), Division of Neighborhood Development and Stabilization.

27.     In December 2001, Plaintiff earned a Bachelor of Science degree in Social Science from Hofstra University.

25.     In May 2008, Plaintiff earned a Masters of Urban Planning – Economic Development and Housing from New York University's Robert F. Wagner Graduate School of Public Service.

26.     On August 25, 2008, Plaintiff began working for HPD as a Section 8 Coordinator in the Division of Tenant Resources, where she supervised a team of over thirty (30) staff, established new procedures to ensure compliance with HPD policies and streamlined the review process for Section 8 cases.

27.     In or around December 2010, Plaintiff assumed the position of Director of Policy & Operations in HPD's Division of Property Disposition and Finance.

28.     Plaintiff was later promoted to Director of Policy & Operations and Workout Projects, also in HPD's Division of Property Disposition and Finance.

29.     As Director of Policy & Operations and Workout Projects, Plaintiff reported to Assistant Commissioner of the Division of Property Disposition and Finance, and coordinated four (4) other directors overseeing a total of thirteen (13) loan programs, handled the agency's executive budget of over $89 million and project managed substantial rehabilitation transactions for loan programs.

30.     In April 2014, Plaintiff took maternity leave for her first child and, upon returning to work in January 2015, was properly reinstated to her previous Director position.

31.     In or around August 2015, Plaintiff transferred to the Community Partnership's Unit ("CP") within the Office of Neighborhood Strategies, to work as a Senior Community Partner in a more Urban Planning/policy focused unit, where she handled significant urban planning and policy assignments and reported to Director of CP, Anusha Venkataraman.

32.     At that time, WEYEL was also a Community Partner in CP's Office of Neighborhood Strategies, had a similar job description, and reported to Venkataraman. Yet, Plaintiff had the "Senior Community Partner" title because she was more experienced than WEYEL.

*Plaintiff begins Working on the Emerald Equity Group Project before Taking Maternity Leave:*

33.     In or around December 2016, Plaintiff began working on a project concerning Emerald Equity Group ("Emerald Equity"), a real estate owner and operator of over fifty (50) Manhattan and Bronx apartment buildings, which was accused of harassing and attempting to displace tenants in rent stabilized buildings.

34.     The project was highly visible and substantial. Plaintiff worked directly with the Land Use Office within Central Staff of the City Council in or around September 2016.

35.     Since Plaintiff was highly involved with the Emerald Equities project and working closely with stakeholders in East Harlem, she was part of the team creating Partners in Preservation ("PIP"), a community-based approach to developing preservation strategies for communities facing displacement.

36.     In or around September 2017, Plaintiff took maternity leave for her second child until March 15, 2018.[1]

37.     Before maternity leave, Plaintiff gave the Emerald Equities project to her colleague Giovania Tiarachristie.

38.     While Plaintiff was on maternity leave, Venkataraman resigned as Director of NS. The NS team was then just Plaintiff, WEYEL, and two entry-level project managers.

39.      KAWITZKY assumed the responsibilities of Director of NS and supervised WEYEL.

40.     During Plaintiff's maternity leave from September 2017 to March 15, 2018, she repeatedly asked KAWITZKY and WEYEL to inform her of any unit restructuring, new projects or developments in her ongoing projects – especially with the prestigious Emerald Equities project and PIP.

41.     Showing her dedication while on leave, Plaintiff had a phone call with KAWITZKY on October 20, 2017 to discuss the unit and his vision for the unit; a phone meeting with WEYEL on December 6, 2017 to discuss the unit's projects; an in-person meeting at HPD on December 7, 2017, regarding the vision for the unit and the potential upcoming posting for

---

[1] Plaintiff's unit was renamed from "CP" to Neighborhood Stabilization ("NS") before her maternity leave.

the position of Directorship of the unit, which Plaintiff attended with her newborn because of lack of childcare; and phone meetings with WEYEL on February 15 and February 22, 2018, to discuss any new updates and work projects.

*The Mayor's Office Announces Establishment of Partners in Preservation Program:*

42.     In or around January 2018, the CITY Mayor's Office announced by a press release the establishment of the PIP, a pilot program that was intended to serve as a community hub for anti-displacement initiatives in select CITY neighborhoods, including East Harlem, with an initial commitment of $1.5 Million for the project.

43.     Plaintiff was excited about PIP, as her work on the Emerald Equities project formed the foundation and beginnings of PIP.

44.     Plaintiff expected that when she returned from maternity leave, she would continue working on PIP.

45.     During maternity leave, KAWITZKY told Plaintiff that upon return she would work on PIP.

*Plaintiff Returns from Maternity Leave:*

46.     On March 15, 2018, Plaintiff returned from maternity leave.

47.     Plaintiff was placed under the supervision of KAWITZKY and immediately began catching up on the Emerald Equities project and pitching ideas for new projects. Plaintiff also had several meetings discussing the formation of PIP.

48.     Upon her return, Plaintiff also received a reasonable accommodation from KAWITZKY to work from home every Friday due to childcare issues for the summer. Plaintiff was also pumping because she was nursing her child.

49.     Despite her eagerness to continue on the Emerald Equities project and PIP, as promised, KAWITZKY discriminatorily failed to reinstate Plaintiff to her former position or an equivalent position.

50.     KAWITZKY did not provide Plaintiff any direction or new assignments.

51.     KAWITZKY told Plaintiff that one of her previous projects, the Landlord Ambassador program, which was very successful, would be relocated to another unit and that she would no longer manage it.[2]

52.     KAWITZKY also moved Plaintiff's other project that she created, the Property's Owner Clinic, to another unit.[3]

53.     Plaintiff was allowed to continue on Emerald Equities but would not be part of PIP, which Emerald Equities informed.

54.     WEYEL and KAWITZKY were the only two people working on PIP.

55.     In or around April 2018, Plaintiff met with KAWITZKY to complain that she had not been returned to her former or an equivalent position and was not assigned a defined role.

56.     KAWITZKY told Plaintiff she could work on a less prestigious project revamping and increasing efficiency in NDS's Contracts Unit.

57.     This was KAWITZKY's empty attempt to placate Plaintiff.

---

[2] "The Landlord Ambassadors Program was a pilot program created to stabilize the physical and financial health of small-and medium-sized multi-family buildings by helping owners implement best building management practices and navigate the process of applying for HPD financing." *See* https://www1.nyc.gov/site/hpd/services-and-information/landlord-ambassador-program.page [*Last visited December 23, 2019*]

[3] "HPD's monthly Property Owner Clinics are an opportunity for small and large residential property owners to learn about how the City's low or no-cost financing and tax benefits can help you make repairs, upgrade or replace major building systems, and lower your operating costs." *See* https://www1.nyc.gov/site/hpd/services-and-information/property-owner-clinics.page [*Last visited December 23, 2019*]

58.     However, unknown to Plaintiff, KAWITZKY failed to fully explain Plaintiff's role in the project to Keishanna Dennis, the Director of Contracts Unit, who was uncomfortable and unclear about Plaintiff's role because she was the Director of the unit.

59.     Given Ms. Dennis' discomfort, in a further act of discrimination motivated by Plaintiff's sex, pregnancy, familial status and caregiver status, KAWITZKY assigned Plaintiff a lesser role as a "Project Manager" instead of her prior title of "Senior Project Manager," and told her to support Ms. Dennis' vision.

60.     After assigning Plaintiff this lesser and reduced role, in which she took no leadership position, KAWITZKY stopped inviting her to project meetings because the vision of the project was being developed by him and Ms. Dennis.

61.     In contrast, KAWITZKY regularly met with WEYEL, who at the time did not have children, on major projects in the unit, while excluding Plaintiff, when the unit only consisted of WEYEL and Plaintiff and two entry-level staff members who also did not have children.

62.     WEYEL already had a high-profile project called the Zombie Homes Initiative. The project has funding through at least June 2021, with the goal of preventing homes from becoming abandoned and decrepit when owners are behind on mortgage payments and protect housing stock from the foreclosure crises. To support that work, WEYEL received two project managers to supervise in 2017. WEYEL also supervised the two project managers when they transitioned to begin working on PIP.

63.     As a result, Plaintiff was even more ostracized and "mommy-tracked."

64.     Plaintiff was also therefore retaliated against for taking FMLA maternity leave to have her second child and using a reasonable accommodation to work from home on Fridays until September 2018, upon her return to work.

*KAWITZKY Continues to Diminish Plaintiff's Role and Work*:

65.     In or around April 2018, Plaintiff asked KAWITZKY for clarity about her role and said she had several ideas for other projects she could start.

66.     Despite Plaintiff's multiple requests that she be kept in the loop while on maternity leave, KAWITZKY told Plaintiff for the first time, at this second April 2018 meeting, that while she was on maternity leave, he had changed the unit's goals and vision. He claimed that Plaintiff's previous projects no longer "made any sense."

67.     KAWITZKY's supposed changes to NS were false and made with the goal of discriminatorily reducing and diminishing Plaintiff's role and pushing her out of HPD entirely.

68.     KAWITZKY further ordered Plaintiff to keep working on the Contracts Unit project and other small projects she had been assigned, and told her she should not focus on PIP, as there was "enough" for her to do.

69.     In reality, Plaintiff did not have enough work to fill her days.

70.     Although KAWITZKY told Plaintiff to focus on the Contracts Unit project, between April and October 2018, he continued to cancel meetings, leaving Plaintiff and Ms. Dennis to meet and carry out the work themselves, without any input or assistance from KAWITZKY to develop the scope and vision of the project, further displaying the project's insignificance to him.

71.     Around this time, and as a direct result of KAWITZKY's discriminatory conduct, Plaintiff developed migraines and sought medical treatment.

72.     Her ability to breastfeed was severely impacted. Her milk production was significantly reduced and made it harder for her to continue her post-birth plan.

*Plaintiff Meets with Deputy Commissioner Leila Bozorg*:

73.     On or around May 29, 2018, Plaintiff met with Leila Bozorg, Deputy Commissioner for NDS, and KAWITZKY's immediate supervisor, to seek guidance on increasing her workload.

74.     Plaintiff asked Ms. Bozorg for additional work since she did not have a full workload and was only helping on small projects.

75.     Ms. Bozorg was dismissive and offered no advice.

*Plaintiff Applies for the Director of Neighborhood Stabilization Position*:

76.     In or around May 2018, a job vacancy notice was posted for the position of Director of Neighborhood Stabilization ("NS Director position").

77.     Plaintiff applied for the NS Director position and was interviewed by KAWITZKY and Alexandra Warren, Director of Operations for Neighborhood Strategies.

78.     On or around June 8, 2018, KAWITZKY informed Plaintiff by phone that she was not selected for the Director position, and that he believed WEYEL was the right person for the position.

79.     Plaintiff, stunned, asked for feedback on her work and how she could better prepare for a future promotion. KAWITZKY told Plaintiff he had not thought of any feedback and would get back to her.

80.     Plaintiff was more qualified, more experienced, and had handled more highly visible projects than WEYEL, had previously held a director position and was bilingual, meaning she could communicate better with the impacted communities.

81.     But for Plaintiff taking her FMLA-guaranteed maternity leave to have her second child and using a reasonable accommodation to work from home on Fridays, Plaintiff would have been selected for the NS Director Position over WEYEL.

82.     As a result of WEYEL's promotion to the NS Director position, on or around June 8, 2018, she became Plaintiff's immediate supervisor.

*Plaintiff Complains of Sex and Pregnancy Discrimination and Retaliation*:

83.     On or around June 19, 2018, after Plaintiff was the only employee WEYEL did not invite to a team breakfast, she requested another meeting with KAWITZKY and again asked for feedback about why she did not get the promotion, along with more insight of her role going forward.

84.     Plaintiff complained that KAWITZKY was not providing enough direction or understanding of her role, and that she was suffering from low morale and stress.

85.     Plaintiff further complained that she was passed over for the Director position because she planned a family, took her FMLA-guaranteed maternity leave to have her second child and was using a reasonable accommodation to work from home on Fridays. Plaintiff explained that she had more experience and was better qualified than WEYEL, given that she had previously worked as a Director in HPD's Division of Property Disposition and Finance.

86.     KAWITZKY did not respond to Plaintiff's complaints of discrimination and retaliation, but instead asked what Plaintiff needed.

87.     When Plaintiff told KAWITZKY that she needed a title change and additional work, he asked her to think of a new title – "something snazzy" – and email him ideas.

88.     Upon information and belief, KAWITZKY had no intention of providing Plaintiff with additional or more substantial work.

*Defendants Continue to Discriminate Against Plaintiff:*

89.     On or around June 22, 2018, WEYEL asked Plaintiff to submit potential job titles along with a brief description that could be used for an announcement to the whole division.

90.     Plaintiff emailed several options for a new title with brief language.

91.     On June 29, 2019, an announcement was sent to the entire division to announce several promotions and Plaintiff's new job title – Director of Preservation Initiatives.

92.     However, the new director title included no new work, responsibilities or projects. It also did not include any increased involvement with PIP.

93.     In or around September 2018, Plaintiff and Ms. Dennis told KAWITZKY that the Contracts Unit project and his ideas for the unit were not attainable, and that the project was not running successfully.

94.     KAWITZKY told Plaintiff to instead begin working on short-term deliverables in the Contracts Unit, an even smaller project that again made Plaintiff unsure about her role. This further reduced her workload.

95.     Shortly after, on or around September 11, 2018, KAWITZKY and WEYEL attended a meeting with City Hall's Land Use Office to discuss PIP and the Emerald Equities project.

96.     KAWITZKY and WEYEL did not invite Plaintiff, even though she was the lead Project Manager on the Emerald Equities project, with the longest history with Emerald Equities.

97.     As she told KAWITZKY and WEYEL afterward, Plaintiff was the Project Manager with the longest history with Emerald Equities. Emerald Equities would be used as a model case study to create PIP. It was essential for Plaintiff to be involved in discussions involving both projects.

98.     Due to KAWITZKY'S actions and despite her multiple requests for work, Plaintiff only had about three hours of work a day. She was given menial tasks like reviewing addresses for mailing and helping staple packets.

99.     The work was humiliating and made Plaintiff feel stuck, with no hope of receiving actual work or new projects.

*Plaintiff is Constructively Discharged on October 9, 2018*:

100.    Due to Defendants' continuing discriminatory and retaliatory conduct, Plaintiff continued to experience migraines and elevated stress levels and developed teeth grinding, which caused her to be fitted for a night guard.

101.    Plaintiff also had to change her diet and take supplements to help with her milk production to help her breastfeeding.

102.    Plaintiff continued to work on small projects and be excluded from the PIP projects, until October 9, 2018, when she could no longer tolerate the discrimination against her.

103.    Defendants' refusal to give Plaintiff actual work and pretending there was no work to assign her was a sham.

104.    A few months after Plaintiff's constructive discharge, Defendants created and filled a Deputy Director position that reported directly to WEYEL with a younger, white female employee with no children who had only two years of experience after graduate school.

105.    Defendants' creation and filling of this Deputy Director position within months of Plaintiff's forced discharge was deliberate and unlawful. While Plaintiff was on maternity leave, she suggested that the new structure have a deputy director position but was told by Defendants that that was not a structure the division was willing to consider.

106.     As a result of the Defendants' discriminatory and retaliatory actions, Plaintiff was forced to end her dedicated and accomplished career with the CITY.

107.     Defendants took all the foregoing actions in order to deprive Plaintiff of employment opportunities and other contractual opportunities because of her sex, pregnancy, familial status and caregiver status, and to violate Plaintiff's rights under the FMLA.

108.     As a proximate result of Defendants' discriminatory conduct towards Plaintiff, Plaintiff has suffered and continues to suffer significant monetary loss, and damages, including the loss of past and future earnings, and other employment benefits.

109.     As a further proximate result of Defendants' actions, Plaintiff suffered and continues to suffer from anxiety, depression, severe emotional distress, lasting embarrassment, humiliation and anguish, as well as other incidental and consequential damages and expenses.

110.     Defendants' conduct was outrageous and malicious, intended to injure Plaintiff, and carried out with reckless indifference to Plaintiff's protected civil rights, thereby entitling her to punitive damages.

111.     Plaintiff has no complete, plain, clear, or adequate remedy at law.

### FIRST COUNT AGAINST ALL DEFENDANTS
**(Interference in Violation of the FMLA under 29 U.S.C. § 2615(a)(1))**

112.     Plaintiff hereby repeats and realleges each allegation in each numbered paragraph above.

113.     Plaintiff is an "employee" as defined under the FMLA.

114.     Defendants CITY, KAWITZKY and WEYEL are each an "employer" for purposes of the FMLA.

115.     Plaintiff was entitled to take leave under the FMLA.

116.     Plaintiff gave notice to Defendants of her intention to take leave under FMLA.

117.    Defendants granted the leave but upon her return from leave under FMLA denied Plaintiff the benefit which she was entitled to under the FMLA.

118.    More specifically, Defendants interfered with Plaintiff's FMLA rights by failing to reinstate Plaintiff to her former position or an equivalent position following her return to work.

119.    As a result of Defendants' actions, Plaintiff was denied benefits to which she was entitled under the FMLA.

120.    By reason of the foregoing, Plaintiff has suffered loss and damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

## SECOND COUNT AGAINST ALL DEFENDANTS
### (Retaliation in Violation of the FMLA under 29 U.S.C. § 2615(a)(2))

121.    Plaintiff repeats and realleges each allegation in each numbered paragraph above.

122.    Plaintiff engaged in protected activity under the FMLA by requesting and taking maternity leave between September 2017 and March 15, 2018, for which she was entitled.

123.    Defendants retaliated against her for taking leave by not reinstating her to her former or an equivalent position when she returned on March 15, 2018; instead, her workload and role were reduced and diminished, she was denied promotion and, ultimately, was constructively discharged on October 9, 2018.

124.    Defendants took all of the foregoing actions in order to deprive Plaintiff of equal employment and other contractual opportunities on account of her engaging in protected activity under the FMLA.

125.    By reason of the foregoing, Plaintiff has suffered loss and damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

## THIRD COUNT AGAINST ALL DEFENDANTS
### (Sex, Pregnancy and Familial Status Discrimination
### in Violation of the NYSHRL)

126.   Plaintiff repeats and realleges each allegation in each numbered paragraph above.

127.   At all relevant times, Plaintiff was an "employee" within the meaning of the NYSHRL.

128.   Plaintiff was pregnant and a member of a protected class.

129.   Plaintiff was satisfactorily performing the duties required by the position.

130.   Defendants subjected Plaintiff to differential terms and conditions of employment because of her sex, pregnancy and familial status.

131.   These differential terms and conditions of employment include, but are not limited to:

a.   Denying reinstatement to her former position or an equivalent position upon her return from maternity leave;

b.   Reducing Plaintiff's workload and role after maternity leave;

c.   Denying Plaintiff promotion to the Director of Neighborhood Stabilization position in favor of a less-qualified, less-experienced white woman who was not pregnant and did not take maternity leave;

d.   Excluding and ostracizing Plaintiff from meetings and team events and

e.   Constructively discharging Plaintiff on October 9, 2018, after her duties continued to be reduced.

132.   All the foregoing actions were taken by Defendants in order to deprive Plaintiff of employment and other contractual opportunities on account of her sex and pregnancy.

133.   By adversely affecting the terms, conditions and privileges of Plaintiff's

employment because of her sex, pregnancy and familial status, Defendants violated the NYSHRL.

134.    By reason of the foregoing, Plaintiff suffered loss and damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

## FOURTH COUNT AGAINST ALL DEFENDANTS
### (Sex, Pregnancy, Familial Status and Caregiver Status Discrimination in Violation of the NYCHRL)

135.    Plaintiff repeats and realleges each allegation in each numbered paragraph above.

136.    At all relevant times, Plaintiff was an "employee" within the meaning of the NYCHRL.

137.    At all relevant times, Plaintiff was a "caregiver" within the meaning of the NYCHRL.

138.    Plaintiff was pregnant and a member of a protected class.

139.    Plaintiff was satisfactorily performing the duties requires by the position.

140.    Defendants subjected Plaintiff to differential terms and conditions of employment because of her sex, pregnancy, familial status and caregiver status.

141.    By adversely affecting the terms, conditions and privileges of Plaintiff's employment because of her sex, pregnancy, familial status and caregiver status, Defendants violated the NYCHRL.

142.    By reason of the wanton, unrepentant, reckless, and egregious conduct of the defendants herein-above alleged, Plaintiff claims punitive damages under this Count.

143.    By reason of the foregoing, Plaintiff suffered loss and damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

## FIFTH COUNT AGAINST ALL DEFENDANTS
### (Retaliation in Violation of the NYSHRL)

144.     Plaintiff repeats and realleges each allegation in each numbered paragraph above.

145.     Defendants' above conduct was retaliation for Plaintiff's complaints of discrimination on the basis of sex, pregnancy, familial status and caregiver status.

146.     All the various actions Defendants took against Plaintiff subsequent to when she complained of discrimination constitute unlawful retaliation in violation of the NYSHRL.

147.     By reason of the foregoing, Plaintiff suffered loss and damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

## SIXTH COUNT AGAINST ALL DEFENDANTS
### (Retaliation in Violation of the NYCHRL)

148.     Plaintiff repeats and realleges each allegation in each numbered paragraph above.

149.     Defendants' above conduct was retaliation for Plaintiff's complaints of discrimination on the basis of sex, pregnancy, familial status and caregiver status, and violated Plaintiff's rights under New York State and New York City Human Rights Law.

150.     All the various actions Defendants took against Plaintiff subsequent to when she complained of discrimination constitute unlawful retaliation in violation of the NYCHRL.

151.     By reason of the foregoing, Plaintiff suffered loss and damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

## PUNITIVE DAMAGES

152.     Plaintiff claims punitive damages by reason of the wanton, unrepentant, reckless and egregious conduct of the defendants herein-above alleged.

**WHEREFORE,** Plaintiff prays that this Court grant her judgment containing the following relief:

a.       Impanel a jury to hear Plaintiff's claims;

b.       An award of damages in an amount to be determined upon trial of this matter to compensate Plaintiff for her monetary loss and damages, including her loss of past and future earnings, bonuses, compensation, and other employment benefits;

c.       An award of damages to compensate Plaintiff for mental anguish, humiliation, embarrassment, and emotional injury for each cause of action;

d.       An award of damages in an amount to be determined upon the trial of this matter to compensate Plaintiff for violations of her rights under the FMLA, the NYSHRL and the NYCHRL;

e.       An award of punitive damages to be determined at the time of trial for each cause of action;

f.       An award of reasonable attorney's fees and costs related to Plaintiff's claims under the FMLA and the NYCHRL, and;

g.       Such other and further relief as this Court may deem just and proper.

Dated: New York, New York
       December 23, 2019

Respectfully Submitted,

SAMUEL O. MADUEGBUNA, ESQ.
**MADUEGBUNA COOPER LLP**
Attorneys for Plaintiff,
JESSICA SANCLEMENTE-GOMEZ
30 Wall Street, 8th Floor
New York, NY 10005
(212) 232-0155

- 20 -

TO:   THE CITY OF NEW YORK
      c/o Corporation Counsel
      Law Department
      100 Church Street
      New York, New York 10007

      SIMON KAWITZKY
      c/o Department of Housing Preservation and Development
      100 Gold Street
      New York, New York 10038

      JENNY WEYEL
      c/o Department of Housing Preservation and Development
      100 Gold Street
      New York, New York 10038

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**                         *Docket No.:*
----------------------------------------------------------------------------------------------------------
JESSICA SANCLEMENTE-GOMEZ,

*Plaintiff,*

-against-

**THE CITY OF NEW YORK, SIMON KAWITZKY, JENNY WEYEL and JOHN and JANE DOE** (said names being fictitious, the persons intended being those who aided and abetted the unlawful conduct of the named Defendants),

*Defendants.*
----------------------------------------------------------------------------------------------------------

**COMPLAINT AND JURY DEMAND**

----------------------------------------------------------------------------------------------------------
*Signature (Rule 130-1.1-a)*

_____

*Print name beneath*
*SAMUEL O. MADUEGBUNA, ESQ.*

_____

*Yours, etc.*

**MADUEGBUNA COOPER LLP**
*Attorneys for Plaintiff*
*30 Wall Street, 8th Floor*
*New York, New York 10005*
*(212) 232- 0155*

*To: All Counsel of Record*
_____
*Service of the within is hereby admitted on*
_____

*Attorneys for*

- 22 -